FILED
CLERK, U.S. DISTRICT COURT

11 APR 01 PM 3: 39

DISTRICT OF UTAH

BY:_____
    DEPUTY CLERK

Anthony L. Rampton (USB #2681)
Ryan M. Harris (USB #8192)
JONES, WALDO, HOLBROOK & McDONOUGH
1500 Wells Fargo Plaza
170 South Main Street
Post Office Box 45444
Salt Lake City, Utah  84145-0444
Telephone: (801) 521-3200
*Attorneys for Margaret Louise Cannon and*
    *Allan Robert Cannon*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| MARGARET LOUISE CANNON and ALLAN ROBERT CANNON, as individuals, <br><br> Plaintiffs, <br><br> vs. <br><br> UNITED STATES OF AMERICA, <br><br> Defendant. | **MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO LIABILITY** <br><br> Civil No. 2: 98 CV 0882 J <br><br> Judge Bruce S. Jenkins |
| F. DOUGLAS CANNON, <br><br> Plaintiff-Intervenor, <br><br> vs. <br><br> UNITED STATES OF AMERICA, <br><br> Defendant. | |

Plaintiffs M. Louise Cannon and Allan Robert Cannon, (the "Cannons"), by and through

their undersigned counsel of record, and pursuant to Fed. R. Civ. P. 56, hereby file this

memorandum in support of their Motion for Partial Summary Judgment as to Liability.

484857v1

*73*

## INTRODUCTION

By this motion, the Cannons ask this Court to finally, after 56 years, hold the United States liable for the undisputed damage caused to the Cannons' property in western Utah as a result of the United States's bombing of the property in 1945. For a three-week-period in 1945 (and, possibly, thereafter as well), the Cannons' own government mercilessly bombed the Cannons' property. The bombs used by the United States included nearly every type of projectile weapon imaginable at the time—conventional high explosive bombs, projectiles carrying incendiary weapons (e.g., Napalm), and projectiles carrying deadly chemical weapons (e.g., hydrogen cyanide and mustard). It is not known how many conventional high-explosive bombs were dropped during the bombing. However, the amount of chemical weapons dropped is known—more than 23 tons of chemical weapons were dropped during the three-week barrage.

It is undisputed that the Cannons' property was damaged by the bombing, and that the United States is the party responsible for that damage. It is also undisputed that the United States has failed, for the last 56 years, to take any action to clean up the mess it left on the Cannons' property following the bombing. Thus, there are no genuine issues of material fact to be decided on the issues of liability. The Cannons are entitled to an entry of summary judgment in their favor as to all issues related to the United States's liability in this matter, and are entitled to damages (and/or other relief) in an amount to be determined at trial.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1.      Margaret Louise Cannon and Allan Robert Cannon are siblings that, together, own a 75% interest in certain patented mining claims (the "Cannon Property") in Tooele County, Utah.  Verified Complaint, ¶ 6.

2.      The other 25% interest is owned by F. Douglas Cannon ("Doug Cannon"), another Cannon sibling who has joined this litigation as a Plaintiff–Intervenor and is separately represented by counsel.  See Affidavit of F. Douglas Cannon, at ¶ 2 (dated May 3, 2000).

3.      The property is located in the Dugway Mountains, directly south and east of the United States Government's Dugway Proving Ground ("DPG") military installation.  Since the 1940s, DPG has been used by the United States Government for the testing of various kinds of military weapons and ordnance.  See Draft Formerly Used Defense Site Engineering Evaluation/Cost Analysis Report (the "EE/CA Report," attached hereto as Exhibit A), dated August 8, 1996, at 2.1.2.1. & Figure 1.1.

4.      The property was acquired in 1920 by Plaintiffs' grandfather, Jesse Fox Cannon, who conducted intermittent mining operations on the property between 1920 and 1945. See Letter of Jesse Fox Cannon, dated July 21, 1950 (attached hereto as Exhibit B).

5.      In 1942, the United States government established DPG immediately to the north and west of the Cannon Property.  DPG was established "to develop and test chemical weapons and biological defense systems."  See EE/CA Report, at 2.1.2.1.

6.      In May 1945, as the war in the Pacific was coming to a climax, it became apparent that "American and Allied forces [were suffering] an unacceptable casualty level from Japanese soldiers in cave fortifications."  Id. at 2.1.2.2.

7.    To combat this problem, the United States military decided to conduct testing to determine the most effective methods of "extract[ing] Japanese soldiers from these 'safe havens' with a minimum loss of life to friendly forces." Id.

8.    To this end, the United States initiated a testing program that came to be known as "Project Sphinx," which would "investigate the effectiveness of various [chemical warfare materiel] and explosive petroleum and butane mixtures in achieving this objective in case an invasion of the Japanese home islands became necessary." Id.

9.    On or about May 21, 1945, officials from the U.S. Army, apparently fearing that there was not enough time for the Army to dig its own caves for the testing associated with Project Sphinx, approached Jesse Fox Cannon to ask him if the United States could use the mines on the Cannon Property for Project Sphinx. For the purposes of this motion only, because the evidence must be viewed in the light most favorable to the nonmovant, it will be assumed that Jesse Fox Cannon gave his oral authorization, in May 1945, for the United States to test weapons on the Cannon Property.[1]

10.    In any event, a few days later the Army asked Jesse Fox Cannon to sign a written agreement allowing the Army to access the Cannon Property. The agreement finally executed by Jesse Fox Cannon allows the Army access to the property, but only "to survey and carry out such exploratory work as may be necessary in connection with the property; to erect buildings and any other type of improvement; and to perform construction work of any nature." See Construction Survey & Exploration Permit, dated May 25, 1945 (attached hereto as Exhibit C), at ¶ 1.

---

[1] The Cannons, of course, reserve the right to refute, at trial, any contention that Jesse Fox Cannon actually did give oral authorization for the bombing.

11.    The initial draft of the agreement contained a provision whereunder Jesse Fox

Cannon "waives and releases any and all claims for damages arising from the activity of the

government, its officers, agents, employees, representatives, or assigns on said land, in the

reasonable exercise of this permit." See id. at ¶ 5 (stricken).

12.    Jesse Fox Cannon refused to sign the agreement with this paragraph included.

Rather, Jesse Fox Cannon crossed out that paragraph, and authored a new one, which reads as

follows:

> , and the government hereby agrees at the expiration of this permit to leave the
> property of the owner in as good condition as it is on the date of the government's
> entry.

Id. at supplement to ¶ 4.

13.    The Army, by and through Lt. William J. Harrington, executed the agreement,

with Jesse Fox Cannon's amendments, on May 25, 1945.  See id.

14.    Despite the lack of written permission to bomb the property, the Army went ahead

with Project Sphinx as planned.  Commencing on June 21, 1945, and for the next twenty-two

days, the Army proceeded to bomb the Cannon Property with nearly every kind of military

projectile imaginable at the time, including high explosives and bombs, incendiary weapons, and

chemical weapons.  See EE/CA Report, at 2.1.2.2.

15.    The incendiary weapons used on the Cannon Property during Project Sphinx

included AVGAS, butane, gasoline, Napalm, PT Jell, and Napalm-gasoline mixtures.  Id.

16.    The chemical weapons used on the Cannon Property included the choking agent

phosgene (CG), the blood agent hydrogen cyanide (AC), and blistering agents mustard (H) and

distilled mustard (HD). Each of these chemical agents is deadly and has the potential to take human life in terrible ways. See id. at 2.1.2.2; 2.4.1; & Table 2-3.

17.     In total, the Army dropped over 3,000 rounds of ammunition containing either chemical or incendiary weapons during Project Sphinx. The vast majority of these rounds contained chemical weapons. See id. at Table 2-1.

18.     The Army dropped more than 23 tons of chemical weapons during Project Sphinx. See A Memorandum Report: Attack Against Cave-Type Fortifications ("1945 Report," attached hereto as Exhibit D), at A-55 to A-86 (1945).

19.     In addition to the chemical and incendiary bombs, the Army also dropped a large amount of conventional-type bombs filled with high explosive material during Project Sphinx. See Report on Ordnance Impacted upon Cannon Property and Its Relationship to Project Sphinx, by Kenneth D. Shott ("Shott Report," attached hereto as Exhibit E).

20.     The exact tonnage of the conventional bombs dropped during Project Sphinx appears to be unknown. Id.

21.     During the testing, and in order to gauge the effectiveness of the particular type of bomb being dropped onto the Cannons' mines, Army personnel would take into the mines various types of animals, chiefly goats and rabbits. The Army personnel would place these animals at various locations in the mine shafts—some near the entrance, some deeper in the mine—and would provide some of the animals with gas masks, and leave some of the animals unmasked. After depositing the animals in the mines, the Army would then drop various weapons on the ground near the mine shafts. Sometimes, the Army concentrated the bombing near the mine shaft openings, and other times the Army would fire weapons at random onto the

mountains containing the mine shafts.  Still other times, the Cannon Property was subject to

aerial "saturation" bombing.  Some mines would be showered with high explosive bombs.

Others would be subjected to intense incendiary weapon drops.  Still others would be bombarded

with munitions carrying deadly chemical weapons.  After the bombings, the Army would

determine whether the animals left inside the mine shafts had survived the attack.  See 1945

Report, at 6-23, A-55 to A-86; Shott Report.

22.     After the Army's testing ceased in July 1945, Jesse Fox Cannon re-entered his

property, and found that major short-term damage had been done to his mines.  First, he had been

forced to cease mining operations for the several weeks of testing, and second, he found that the

timbering and support of many of the mine shafts had been damaged or destroyed during the

Army's testing.  Jesse Fox Cannon filed two administrative claims against the Army, and

received $755.48 to compensate him for the cessation of operations, and received $2064 to

compensate him for the damage done to the timbering in the mine shafts.  See First and Second

Administrative Claims (attached hereto as Exhibit F).

23.     A short time later, it came to Jesse Fox Cannon's attention that chemical weapons

may have been used during Project Sphinx.  Unable to confirm or deny his suspicion that the

Cannon Property had suffered longer-term contamination from the chemical weapons testing,

Mr. Cannon filed a third administrative claim with the Army, this time seeking $5000 in

compensation for longer-term damage done to the property in connection with the chemical

weapons testing.  In 1951, the Army summarily denied this claim, concluding that the property

"is not contaminated with poisonous gases."  See Third Administrative Claim (attached hereto as

Exhibit G).

24.     In the late 1970s, after more than three decades of testing chemical, biological,

and radiological weapons at (and around) DPG, the Army finally became curious about longer-

term contamination at DPG, and conducted a comprehensive study of contaminated lands at the

entire installation.  In 1979, the U.S. Army Toxic and Hazardous Materials Agency

(USTHAMA) issued a report detailing the results of its study.  The only conclusion that the

Army could come to regarding the Cannon Property, however, was that weapons testing did

occur there in the 1940s.  The Army was unable to come to any conclusions regarding longer-

term contamination on the Cannon Property because "[c]omplete documentation was lacking for

this area."  See Installation Assessment of Dugway Proving Ground, at 71 (1979) (excerpts of

which are attached hereto as Exhibit H).

25.     The Army recommended, however, that DPG quickly take action "to better define

the hazards and problems of [unexploded ordnance]" on the Cannon Property.  Id. at 73.

26.     In 1988, the Army released a follow-up report regarding contamination at DPG.

However, the Army was still unable to determine whether longer-term contamination had

occurred on the Cannon Property.  The report stated that, despite the exhortation of the previous

report to "further define the hazards" contained in the Cannon Property, "[d]ue to a lack of

records, it has been impossible to further define the potential [unexploded ordnance] problems"

on the Cannon Property.  See Update of the Initial Installation Assessment of Dugway Proving

Ground, UT, at 2-3 (1988) (excerpts of which are attached hereto as Exhibit I).

27.     In 1993, still without knowing with any certainty that longer-term contamination

existed on the Cannon Property, the Army conducted a risk assessment for the Yellow Jacket

area—an area that includes portions of the Cannon Property.  This risk assessment gave the

Yellow Jacket area a "catastrophic hazard severity" rating, because any human contact with possible chemical weapons or other unexploded ordnance in the area would have "catastrophic" consequences. See Archives Search Report, Conclusions and Recommendations ("Archives Search Report," attached hereto as Exhibit J), at Exhibit A (1993).

28.     In 1994, the United States finally decided to determine once and for all whether and to what extent the areas including the Cannon Property were contaminated.  The United States Army Corps of Engineers (COE), in cooperation with DPG, began conducting a geophysical survey of the Cannon Property "to determine whether or not these lands have been impacted by unexploded ordnance."  COE Letter (attached hereto as Exhibit K) (emphasis added).

29.     The geophysical survey was conducted by a company—Montgomery Watson—hired by the government.  In conducting the survey, Montgomery Watson did not search every inch of the 1,417 acres owned by the Cannons; in fact, Montgomery Watson searched portions of only five (5) of the 87 patented mining claims owned by the Cannons.  Even within these 5 patented claims, Montgomery Watson searched only certain specified "search grids."  These search grids were 100' x 200' in size.  There were 40 such grids on the Yellow Jacket portion of the surveyed property, with 28 of these grids on the Cannon Property.  There were 5 such grids on the Great Western portion of the surveyed property, with one of these grids on the Cannon Property.  See EE/CA Report, at 2.3.1.3., Table 2.2; Deposition of Gary Enloe ("Enloe Depo.," excerpts of which are attached hereto as Exhibit L), at 15.

30.     On these search grids, Montgomery Watson would "examine the surface and subsurface in an non-intrusive manner," using magnetometers and other equipment, to locate

"geophysical anomalies" that might represent weapons or other warfare materiel. See EE/CA Report, at 2.3.2.

31.     In some instances where anomalies were encountered, Montgomery Watson personnel would physically dig into the soil to determine whether the anomaly was a bomb or something else. See Enloe Depo., at 14.

32.     Montgomery Watson did not enter the mine shafts themselves, and did not conduct any work inside the mine shafts. See id. at 28.

33.     In August 1996, more than two years after the survey was begun, the United States finally released a draft report documenting the results of the geophysical survey project commenced in 1994. On the surface of the Cannon Property, without even searching inside the mines themselves, and without searching the entire property, researchers found the following items:

a.     one 4.2-inch mortar round filled with high explosives;
b.     four partially intact to intact burster tubes and fuses from M47 100-pound chemical-filled bombs containing remnant amounts of deadly mustard gas;
c.     three partially intact to intact burster tubes and fuses from 7.2-inch chemical rockets, some of which were still inside burst warhead casings;
d.     one partially intact burster tube from a 7.2-inch chemical rocket, containing high explosives;
e.     one 7.2-inch rocket fins, condition unknown;
f.     other less harmful munitions-related debris, such as burst bomb casings and spent rocket motors.

See EE/CA Report (Exhibit A), at 2.3.3.4, 2.3.3.6.

34.     The 4.2 inch mortar round was still capable of exploding. See Enloe Depo., at 19.

35.     These items were destroyed by U.S. Army officials. See EE/CA Report (Exhibit A), at 2.3.3.5.

36.     In addition to the ordnance and warfare materiel found on the surface of the searched portions of the Cannon Property, researchers discovered a large amount of sub-surface geophysical anomalies within the search grids on the Cannon Property.  In some search grids, over 300 anomalies were found.  The researchers concluded that "[n]o assumptions can be made as to what percentage of subsurface geophysical anomalies are actually" chemical weapons, unexploded ordnance, or related items. Id. at 2.3.3.2, 2.3.3.3.

37.     Montgomery Watson concluded that, because of "[t]he density of the geophysical anomalies and ordnance-related debris, the presence of [unexploded ordnance] and . . . related items on the surface, and the presence of multiple spent ordnance items," "a relatively higher hazard exists due to [unexploded ordnance or chemical warfare materiel] contamination at the Yellow Jacket Mines [which contain mostly Cannon Property] than at the other investigation areas." Id. at 2.3.3.7.

38.     The report discussed five possible alternatives for the studied lands:

a.     Alternative 1—No Further Action;
b.     Alternative 2—Fencing, Posting Signs, Public Awareness, Training, and Land Management Plan;
c.     Alternative 3—Acquisition of Mine Claims and Property Titles, Fencing, Posting Signs, and Land Management Plan;
d.     Alternative 4—Acquisition of Mine Claims and Property Titles, Fencing, Posting Signs, Land Management Plan, Limited Removal Action for [Unexploded Ordnance and Chemical Warfare Materiel], and Mine Sealing;
e.     Alternative 5—Full-Scale Removal of [Unexploded Ordnance and Chemical Warfare Materiel] and Mine Clearance.

Id. at 4.3.

39.     For the Yellow Jacket Mines portion of the studied property, which portion consists largely of portions of the Cannon Property, the report stated that "[b]ased on the findings

of the field investigation and the cost-benefit analysis . . . , Alternative 4 (Acquisition of Mine

Claims and Property Titles, Posting Signs, Land Management Plan, Limited Removal Action for

[Unexploded Ordnance and Chemical Warfare Materiel], and Mine Sealing) is the recommended

removal action alternative." Id. at 6.1.0.3.

40.     Montgomery Watson, as part of its "cost analysis," rejected the only one of the

five alternatives that included clean-up of the property—Alternative 5—because of cost

concerns.  Montgomery Watson estimates that it would cost approximately $12,300,000 for

"Full-Scale Removal" of the unexploded ordnance, chemical warfare materiel, and other

munitions-related debris in the Yellow Jacket Mines area of the surveyed property.  See id. at

4.3.5, Table 4-11, Table 5-1.

41.     The Yellow Jacket area of the surveyed property consists of only 125 acres, and

contains portions of only 5 of the Cannons' 87 patented claims.  See id. at Table 4-11, Table 2-2.

Full-scale cleanup and removal for the full 1,417 acres of Cannon Property would undoubtedly

cost a great deal more than $12,300,000.

42.     Since 1996, the United States has taken no action associated with the conclusions

of the EE/CA Report.  The United States has not taken any action to clean up the property or to

compensate the Cannons; in fact, the United States has, "due to funding constraints," never even

issued a final version of the EE/CA Report.  See Enloe Depo., at 8-10.

## ARGUMENT

It is undisputed that the United States bombed the Cannon Property in 1945, without the Cannons' written authorization, and that this bombing caused damage to the property. It is also undisputed that hundreds of pieces of ordnance (some of which are unexploded) and other munitions-related debris still exist today on the Cannon Property because the United States has not taken any action in the last 56 years to clean up the mess it made on the Cannons' private property, despite a contractual obligation to do so. It is high time that the United States be compelled to clean up its mess.

The Cannons have brought four causes of action against the United States in an effort to spur the government into taking some action on the property. First, the Cannons allege that the United States has tortiously damaged their property. Second, the Cannons allege that the United States has trespassed, and indeed still is trespassing, on the Cannon Property. Third, the Cannons allege that the United States has deprived the Cannons of the quiet enjoyment of their property. Finally, the Cannons allege that the United States's actions constitute a nuisance under Utah law.

The facts related to each of these causes of action are undisputed. The United States's actions in bombing the Cannon Property during Project Sphinx undisputably damaged the property, constituted (and still constitutes) a trespass, deprived (and is still depriving) the Cannons of the quiet enjoyment of their property, and constituted (and still constitutes) a nuisance under Utah law. The Cannons are entitled to judgment as a matter of law as to the United States's liability on each of these four causes of action, and by this motion ask this Court

to enter summary judgment in their favor on these issues.  At trial, this Court will then be asked

to determine the amount of damages (and/or other relief) to which the Cannons are entitled.

## I.   UNDER THE FEDERAL TORT CLAIMS ACT, THE LAW OF THE PLACE WHERE THE TORT OCCURRED SHOULD BE APPLIED

The FTCA "makes the United States liable on tort claims under those circumstances in

which a private individual would be liable under state law." Flynn v. United States, 902 F.2d

1524, 1527 (10th Cir. 1990).  Thus, in this case, this Court must look to Utah law "to determine

whether the United States is liable to the plaintiffs." Id.

## II.   THE UNITED STATES IS LIABLE TO THE CANNONS FOR DAMAGING THE CANNON PROPERTY

Both the FTCA as well as Utah law allow claimants to bring "a tort action for property

damage." See, e.g., Andreason v Aetna Cas. & Sur. Co., 848 P.2d 171, 178 (Utah Ct. App.

1993); see also Hatahley v. United States, 351 U.S. 173, 180 (1956) (stating that the FTCA

"authorizes suits against the Government for 'loss of property'" (quoting the FTCA)).  The

Cannons have brought such a claim, and they are entitled to entry of summary judgment as to

liability on this claim, because the United States has damaged the Cannons' property.

As discussed above, the United States, without the written permission of Jesse Fox

Cannon, used the Cannon Property for the testing of various types of deadly weapons, including

high explosives, chemical weapons, incendiary weapons, etc.  It is undisputed that the United

States, during Project Sphinx, dropped several tons of chemical weapons onto the Cannon

Property, along with an undetermined amount of conventional high-explosive bombs.

This activity damaged the Cannon Property in three discrete ways. First, the property was damaged in that Jesse Fox Cannon was unable to mine the property for the six week period in May-July 1945 during which Project Sphinx was in operation. Second, the timbers and shafts of some of the mines were damaged as a result of the bombing, and required repair. These two categories of damages were acknowledged by the Army in late 1945, and Jesse Fox Cannon was compensated, in small amounts, for these categories of damages.

Third, and most significantly, the Cannon Property suffered longer-term damage as a result of the bombing, such that it is now unsuitable, due to the danger of a "catastrophic" event, for literally **any** type of activity, unless and until it is cleaned up and all of the munitions debris is removed from the property. Initially, the United States denied that any such damage had occurred as a result of Project Sphinx, and denied an administrative claim along these lines filed by Jesse Fox Cannon. However, in the ensuing decades, the United States has taken a different position. The United States itself, in 1993, conducted a risk assessment of the property, and gave the Cannon Property a "catastrophic hazard severity" rating, because any human contact with possible chemical weapons or other unexploded ordnance in the area would have "catastrophic" consequences. See Archives Search Report (Exhibit J), at Exhibit A. As a result of these concerns, which had been developing for decades, the United States hired Montgomery Watson to conduct a geophysical survey of the Cannon Property to determine whether the property was still impacted by the 1940s-era bombing that had occurred, and, if so, the extent of that impact. The United States's own contractor concluded, after surveying only a portion of the property, that the risks associated with the property were so severe that the best solution to the problem would

be for the United States to purchase the property from the Cannons, fence it off to prevent

recreationists or other users from accessing it, and permanently seal the mines. See EE/CA

Report (Exhibit A), at 4.3. The United States, through its contractor, has made the determination

(for the first time in 1996) that the Cannon Property has suffered longer-term, severe

consequences from the Project Sphinx bombing. According to the United States and its

contractor, the property contains an unknown number of exploded and unexploded bombs, in

addition to hundreds if not thousands of pieces of other munitions-related debris, and the

property is unsafe for even recreational use.[2] See id. at 2.3.3.7.

There can be no dispute that the United States has inflicted damage to the Cannon

Property for which neither the Cannons nor their father or grandfather was ever compensated.

The Cannons are entitled to summary judgment on this point, and, in addition, are entitled to an

award of damages (and/or other relief) in an amount to be determined at trial.

## III.     THE UNITED STATES IS LIABLE TO THE CANNONS FOR TRESPASS

The United States's actions in dropping tons of munitions onto the Cannon Property and

the United States's ensuing failure to clean up the munitions constitutes a continuing trespass

under Utah law. Both the FTCA as well as Utah law allow claimants to bring actions for

trespass. See, e.g., Walker Drug Co. v. La Sal Oil Co., 972 P.2d 1238, 1243 (Utah 1998)

(defining "trespass" as a 'wrongful entry upon the lands of another'" (quoting O'Neill v. San

Pedro, L.A. & S.L. R. Co., 114 P. 127, 128 (Utah 1911)); see also United States v. Gaidys, 194

---

[2] Again, this conclusion was reached without searching in the mines themselves.
See Statement of Undisputed Material Facts, at ¶¶ 32-33. At this time, there is no way to tell
whether any chemical weapons contamination is still present within the mines themselves.

F.2d 762, 764 (10th Cir. 1952) (allowing property owners to bring a claim for trespass under the

FTCA when a military aircraft crashed over their property and dropped "[b]urning parts of the

plane and flaming fuel" onto the plaintiffs' property, and stating that the plaintiffs' claims are

"well within the kinds and classes of claims for tort wrongs which Congress intended should be

judicially determined under the [FTCA]").  Under the Restatement (Second) of Torts, section

158, which Utah has adopted, see Walker Drug, 972 P.2d at 1243, "trespass" is defined in the

following manner:

> One is subject to liability to another for trespass, irrespective of whether he
> thereby causes harm to any legally protected interest of the other, if he
> intentionally
> > (a) enters land in the possession of the other, or causes a thing or a third
> > person to do so, or
> > (b) remains on the land, or
> > (c) fails to remove from the land a thing which he is under a duty to remove.

Restatement (Second) Torts, § 158.

The United States has committed a trespass under both subsection (a) and subsection (c)

of section 158.  In 1945, the United States intentionally entered the Cannon Property.  Although

the United States had permission to enter the property for certain purposes (such as construction,

exploration, and surveying), it did not have permission to enter the property to drop bombs on the

property, and did not have permission to damage the property.  By its unauthorized actions, in

dropping several tons of chemical weapons and an undetermined amount of conventional high-

explosive bombs on the Cannon Property, the United States unquestionably committed a trespass

under Utah law.  See Walker Drug, 972 P.2d at 1243; see also Gaidys, 194 F.2d at 764.

Moreover, it is undisputed that many bombs (both exploded and unexploded), shrapnel, fragments, and hundreds of other pieces of munitions-related debris remain to this day on the Cannon Property. There can be no dispute that the United States placed objects (e.g., bombs) on the Cannon Property, and has since failed to remove those objects from the property, despite a contractual obligation to leave the property in as good a condition as it was in prior to the United States's entry. Under the Restatement (Second) of Torts, §§ 158, 160-61, this action constituted (and still constitutes) a trespass, regardless of whether Jesse Fox Cannon ever gave oral permission for the United States to drop the bombs on the property. Section 160[3] reads as follows:

> A trespass may be committed by the continued presence on the land of a structure, chattel, or other thing which the actor or his predecessor in legal interest has placed on the land
> (a) with the consent of the person then in possession of the land, **if the actor fails to remove it after the consent has been effectively terminated**, or
> (b) pursuant to a privilege conferred on the actor irrespective of the possessor's consent, if the actor fails to remove it after the privilege has been terminated, by the accomplishment of its purpose or otherwise.

---

[3] If, as the Construction, Exploration and Survey Permit states, Jesse Fox Cannon did not in fact ever consent to allow the United States to bomb the Cannon Property, the conclusion remains unchanged, because, in that case, the United States committed a trespass pursuant to section 161 (rather than section 160) of the Restatement by tortiously bombing the property. That section states as follows:

> A trespass may be committed by the continued presence on the land of a structure, chattel, or other thing which the actor has tortiously placed there, whether or not the actor has the ability to remove it.

Restatement (Second) Torts, § 161(a); see also Rosenthal v. City of Crystal Lake, 525 N.E.2d 1176 (Ill. Ct. App. 1988).

Restatement (Second) Torts, § 160 (emphasis added).  Utah's appellate courts have applied this

section.  See U.P.C., Inc. v. R.O.A. General, Inc., 1999 UT App 303, ¶41 & n.5, 990 P.2d 945,

955 n.5.  Under the analysis of the U.P.C. Court, a party who has permission to use the property

of another, but has a contractual duty to "restore the premises to their former condition" but does

not do so, has committed a trespass.  See id.  This analysis applies squarely to this case, because,

even assuming, *arguendo*, that the United States was ever authorized to bomb the Cannon

Property, Jesse Fox Cannon made certain that the United States was obligated by contract to

"leave the property of the owner in as good condition as it is on the date of the government's

entry."  See Permit (Exhibit C), at supplemental ¶ 4.  It is beyond dispute that the United States

did not leave the Cannon Property in as good a condition as it was on the date of the

government's entry.  The United States had a contractual obligation to remove the bombs.  Its

failure to remove the bombs, as required by contract, constitutes a continuing trespass under the

Restatement and under Utah law.

There can be no doubt that the United States has committed a trespass on the Cannon

Property.  The Cannons are entitled to summary judgment on that point, and are entitled to

damages (and/or other relief) for that trespass in an amount to be determined at trial.

## IV.    THE UNITED STATES IS LIABLE TO THE CANNONS FOR LOSS OF QUIET ENJOYMENT

Utah courts have recognized that one of the most "important attribute[s] of the ownership

of real property [is] the right to the quiet and peaceful enjoyment of it."  See Leavitt v. Blohm,

357 P.2d 190, 193 (Utah 1960).  The United States, by bombing the Cannon Property and then by

failing to clean up the property, has unreasonably interfered with the Cannons' right of quiet

enjoyment of their property. According to the United States and its own contractor, there are substantial risks of a "catastrophic" event occurring on the property, and the property is unsafe even for recreational purposes. The Cannons are entitled to entry of summary judgment on this point, and are entitled to damages (and/or other relief) in an amount to be determined at trial.

## V.      THE UNITED STATES IS LIABLE TO THE CANNONS FOR NUISANCE

The United States's actions in dropping tons of munitions onto the Cannon Property and the United States's ensuing failure to clean up the munitions and failure to even warn the citizens of the State of Utah about the munitions constitutes both a public and private nuisance under Utah law. Both the FTCA as well as Utah law allow claimants to bring an action for nuisance. See Stevenson v. Goodson, 924 P.2d 339, 348 (Utah 1996); Erickson v. Sorenson, 877 P.2d 144, 148-50 (Utah Ct. App. 1994); see also Palm v. United States, 835 F. Supp. 512, 515-18 (N.D. Cal. 1993) (allowing the plaintiff to bring a claim for, *inter alia*, nuisance where the United States had "land[ed] and explod[ed] . . . projectiles onto Plaintiffs' properties").

### A.      The United States's Actions Constitute a Public Nuisance

The United States's actions during Project Sphinx, as well as thereafter, constitute a public nuisance, in violation of Utah Code Ann. § 76-10-803. That statute reads in full as follows:

> (1) A public nuisance is a crime against the order and economy of the state and consists in unlawfully doing any act or omitting to perform any duty, which act or omission
>> (a) annoys, injures, or endangers the comfort, repose, health or safety of three or more persons;
>> (b) offends public decency;

(c) unlawfully interferes with, obstructs, or tends to obstruct, or renders dangerous for passage, any lake, stream, canal, or basin, or any public park, square, street, or highway;

(d) is a nuisance defined in Section 78-38-9; or

(e) in any way renders three or more persons insecure in life or the use of property.

(2) An act which affects three or more persons in any of the ways specified in this section is still a nuisance regardless of the extent to which the annoyance or damage inflicted on individuals is unequal.

Utah Code Ann. § 76-10-803.

### 1.    The Cannons have a private right of action for public nuisance.

Although Utah Code Ann. § 76-10-806 authorizes public officials to bring an action for abatement of a public nuisance, it is settled in Utah that private persons also have a right of action for abatement of a public nuisance, as long as the private party can show that the defendant's conduct is unreasonable and that the plaintiff has suffered injury different from the general societal injury inflicted by the public nuisance. See Erickson v. Sorenson, 877 P.2d 144, 148-50 (Utah Ct. App. 1994).

The first prerequisite is met here, because the United States's conduct was unreasonable. Under Utah law, "[c]onduct creating a nuisance which harms the plaintiff is unreasonable only where it is intentional, negligent, reckless, or ultrahazardous." Id. at 149. The United States's actions during Project Sphinx fit into all four categories. The United States intentionally dropped tons of chemical and other munitions on the Cannon Property. It can scarcely be questioned that the dropping of bombs, without written authorization, onto private property is an ultrahazardous activity. The United States's conduct was unreasonable under Utah law.

The second prerequisite is also met here, because the Cannons have suffered injury different from the general societal injury inflicted by the United States. Most of Utah's population has suffered some injury from the bombs dropped on the Cannon Property, because of the danger, however remote, that an unexploded chemical bomb may be detonated (by a hiker, hunter, miner, etc.) on the Cannon Property, approximately forty miles upwind from Utah's major population centers. The United States has termed this a "catastrophic" event, should it occur. See Archives Search Report (Exhibit J), at Exhibit A. The Cannons share in this injury. In addition to this injury, however, the Cannons have suffered additional injury different from the general injury suffered by the public at large. The Cannons' property has been directly damaged by the United States's activities.

Thus, both of the prerequisites have been met here, and therefore the Cannons can bring a private right of action against the United States for public nuisance.

### 2.   The United States's actions fit within Utah's public nuisance statute.

The United States's actions associated with Project Sphinx fit within three of the subsections of Utah's public nuisance statute. First, the United States's "act or omission annoys, injures, or endangers the comfort, repose, health or safety of three or more persons." See Utah Code Ann. § 76-10-803(1)(a). The three Cannons, plaintiffs in this action, have been deprived of their comfort and repose in their use of their property. This, in itself, is enough to satisfy the statute. However, as stated above, most of Utah's population shares in at least some danger to health and safety, given the possibility, however remote, that one of these chemical munitions could be detonated upwind from population centers.

Second, the United States's action "offends public decency." See Utah Code Ann. § 76-10-803(1)(b). Certainly, public decency is offended when a government intentionally and without written authorization drops bombs, including bombs containing chemical weapons, on the property of its own citizens.

Third, the United States's action "renders three or more persons insecure in life or the use of property." See Utah Code Ann. § 76-10-803(1)(e). Again, the three Cannons have been rendered insecure in the use of their property. And, a great many of Utah's citizens have been rendered insecure in life by the possibility of a chemical weapons explosion on the Cannon Property.

In short, the public nuisance statute applies here. The United States's actions constitute a public nuisance. This Court should enter summary judgment as to the United States's liability under this statute, and should award damages (and/or other relief) in an amount to be determined at trial.

**B.      The United States's Actions Constitute a Private Nuisance**

The United States's actions during Project Sphinx, as well as thereafter, constitute a private nuisance under Utah law. This cause of action "seeks compensation for damages caused by a substantial and unreasonable interference with the private use and enjoyment of land." See Stevenson v. Goodson, 924 P.2d 339, 348 (Utah 1996) (citing Sanford v. University of Utah, 488 P.2d 741-744-45 (Utah 1971)). As discussed above, the United States's actions in bombing the Cannon Property were unreasonable, and caused substantial damage to the property, and have interfered with the Cannons' ability to use and enjoy their private property. Therefore, the

Cannons are entitled to summary judgment as to liability on this cause of action, and should be awarded damages (and/or other relief) in an amount to be determined at trial.

## CONCLUSION

In 1945, the United States dropped tens of tons of military ordnance, including chemical weapons, incendiary weapons, and high explosive bombs, on the private property of the Cannons. This bombing caused severe damage to the Cannon Property. Since 1945, the United States has not taken any action to clean up the mess it left on the Cannon Property, despite a contractual obligation to do so. The United States is unquestionably liable for this damage, as there is no genuine factual dispute that the United States is the entity that caused the damage to the Cannon Property. Therefore, the Cannons ask this Court to enter summary judgment in their favor on all issues relating to the United States's liability, and to award the Cannons damages (and/or other relief) in an amount to be determined at trial. For all the foregoing reasons, the Cannons' motion for partial summary judgment should be granted.

DATED this __11th__ day of April, 2001.

JONES, WALDO, HOLBROOK & McDONOUGH

By_____
    Anthony L. Rampton
    Ryan M. Harris
    *Attorneys for Margaret Louise Cannon and*
    *Allan Robert Cannon*

484857v1

-12-

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the $\underline{11^{th}}$ day of April, 2001, I caused a true and correct

copy of the **MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY**

**JUDGMENT AS TO LIABILITY**, along with the Exhibits cited therein, to be sent, via the

following means, to the following:


**VIA FEDERAL EXPRESS**:

> Gay Elizabeth Kang
> Trial Attorney
> United States Department of Justice
> Civil Division/Torts Branch
> P.O. Box 340
> Washington, D.C.  20044
> Fax No. (202) 616 4989


**VIA FIRST CLASS U.S. MAIL**:

> Melvin E. Leslie
> 4444 South 700 East, #203
> Salt Lake City, Utah 84107
> Fax No. 281 1724
>
> Daniel Price
> Assistant U.S. Attorney
> United States Attorney's Office
> 185 South State Street, Suite 400
> Salt Lake City, Utah  84111