

Anthony L. Rampton (USB #2681)
Ryan M. Harris (USB #8192)
JONES, WALDO, HOLBROOK & McDONOUGH
1500 Wells Fargo Plaza
170 South Main Street
Post Office Box 45444
Salt Lake City, Utah 84145-0444
Telephone: (801) 521-3200
*Attorneys for Margaret Louise Cannon and*
    *Allan Robert Cannon*

### IN THE UNITED STATES DISTRICT COURT
### DISTRICT OF UTAH, CENTRAL DIVISION

|  |  |
|---|---|
| MARGARET LOUISE CANNON and ALLAN ROBERT CANNON, as individuals,   : | |
|             Plaintiffs,   : | |
| vs.   : | **MEMORANDUM IN OPPOSITION TO** |
| UNITED STATES OF AMERICA,   : | **MOTION OF THE UNITED STATES** |
|             Defendant.   : | **TO DISMISS** |
|   : | Civil No. 2: 98 CV 0882 J |
| F. DOUGLAS CANNON,   : | Judge Bruce S. Jenkins |
|             Plaintiff-Intervenor,   : | |
| vs.   : | |
| UNITED STATES OF AMERICA,   : | |
|             Defendant.   : | |

Plaintiffs M. Louise Cannon and Allan Robert Cannon, (the "Cannons"), by and through

their undersigned counsel of record, hereby file this memorandum in opposition to the Motion of

the United States to Dismiss, dated April 13, 2001.

488230v1



## INTRODUCTION

By this motion, the United States is making yet another attempt to avoid compensating the Cannons for the damage done to their property as a result of government bombing. This time, the United States is arguing that its decision to bomb the Cannons' property and its subsequent refusal to clean up the toxic mess it left on the property—despite a contractual obligation to clean up the mess—are decisions protected by the "discretionary function exception" to the Federal Tort Claims Act (FTCA). This argument is without merit.

First, the United States and its employees simply did not possess any discretion to take the actions they took. The United States does not have discretion to wantonly trespass on the private land of its citizens, leave a toxic mess there, and refuse to clean up the mess despite a plain contractual duty to do so. Where, as here, the United States and its employees are bound to follow a particular course of action, the discretionary function exception cannot, by definition, apply to protect governmental decisions that deviate from that mandatory course of action.

Second, the discretionary function exception was not intended to protect government decisions to trespass upon the private land of its citizens and to willfully refuse to perform duties mandated by a contract the United States had entered into with its citizens. The exception was intended to protect only decisions grounded in public policy, and the United States has not identified a single public policy that is advanced by United States actions involving its continuing, willful trespass upon the Cannons' property.

For these reasons, and as more fully discussed below, the United States' motion should be denied in its entirety.

## BACKGROUND

1.      Margaret Louise Cannon and Allan Robert Cannon are siblings that, together, own a 75% interest in certain patented mining claims (the "Cannon Property") in Tooele County, Utah.  Verified Complaint, ¶ 6.

2.      The other 25% interest is owned by F. Douglas Cannon, another Cannon sibling who has joined this litigation as a Plaintiff–Intervenor and is separately represented by counsel. See Affidavit of F. Douglas Cannon, at ¶ 2 (dated May 3, 2000).

3.      The property is located in the Dugway Mountains, directly south and east of the United States Government's Dugway Proving Ground ("DPG") military installation.  Since the 1940s, DPG has been used by the United States Government for the testing of various kinds of military weapons and ordnance.  See Draft Formerly Used Defense Site Engineering Evaluation/Cost Analysis Report (the "EE/CA Report")[1], dated August 8, 1996, at 2.1.2.1. & Figure 1.1.

4.      The property was acquired in 1920 by Plaintiffs' grandfather, Jesse Fox Cannon, who conducted intermittent mining operations on the property between 1920 and 1945. See Letter of Jesse Fox Cannon, dated July 21, 1950.

5.      In 1942, the United States government established DPG immediately to the north and west of the Cannon Property.  DPG was established "to develop and test chemical weapons and biological defense systems."  See EE/CA Report, at 2.1.2.1.

---

[1]  All of the exhibits referred to in this memorandum were submitted with the Cannons' Memorandum in Support of Motion for Partial Summary Judgment as to Liability, and are already in the possession of this Court and opposing counsel.  In order to avoid unduly burdening the record in this case, these same exhibits are not separately attached hereto.

6.    In May 1945, as the war in the Pacific was coming to a climax, it became apparent that "American and Allied forces [were suffering] an unacceptable casualty level from Japanese soldiers in cave fortifications." Id. at 2.1.2.2.

7.    To combat this problem, the United States military decided to conduct testing to determine the most effective methods of "extract[ing] Japanese soldiers from these 'safe havens' with a minimum loss of life to friendly forces." Id.

8.    To this end, the United States initiated a testing program that came to be known as "Project Sphinx," which would "investigate the effectiveness of various [chemical warfare materiel] and explosive petroleum and butane mixtures in achieving this objective in case an invasion of the Japanese home islands became necessary." Id.

9.    On or about May 21, 1945, officials from the U.S. Army, apparently fearing that there was not enough time for the Army to dig its own caves for the testing associated with Project Sphinx, approached Jesse Fox Cannon to ask him if the United States could use the mines on the Cannon Property for Project Sphinx. For the purposes of this motion only, because the evidence must be viewed in the light most favorable to the nonmovant, it must be assumed that Jesse Fox Cannon did not give his oral authorization, in May 1945, for the United States to test weapons on the Cannon Property.[2]

---

[2] This assumption must be made because the parties dispute the factual question regarding whether Jesse Fox Cannon gave permission for the bombing. The Cannons' position is that the written Construction, Survey & Exploration Permit is unambiguous and speaks for itself. Nowhere in the written agreement does Mr. Cannon authorize the United States to bomb his property. To the extent that evidence exists of oral communications, prior to the signing of the written agreement, between Jesse Fox Cannon and the Army to allow weapons testing and "damage" on the Cannon Property, such evidence is inadmissible under the parol evidence rule

(continued...)

10.   In any event, a few days later the Army asked Jesse Fox Cannon to sign a written agreement allowing the Army to access the Cannon Property.  The agreement finally executed by Jesse Fox Cannon allows the Army access to the property, but only "to survey and carry out such exploratory work as may be necessary in connection with the property; to erect buildings and any other type of improvement; and to perform construction work of any nature."  See Construction Survey & Exploration Permit, dated May 25, 1945, at ¶ 1.

11.   The initial draft of the agreement contained a provision whereunder Jesse Fox Cannon "waives and releases any and all claims for damages arising from the activity of the government, its officers, agents, employees, representatives, or assigns on said land, in the reasonable exercise of this permit."  See id. at ¶ 5 (stricken).

12.   Jesse Fox Cannon refused to sign the agreement with this paragraph included.  Rather, Jesse Fox Cannon crossed out that paragraph, and authored a new one, which reads as follows:

---

² (...continued)
and the merger doctrine.  Evidence of any oral arrangement Jesse Fox Cannon had with the Army, if that oral arrangement contradicts the plain language of the Construction, Survey & Exploration Permit, is inadmissible.  In Utah, as in most jurisdictions, "parol evidence is inadmissible to explain or modify an unambiguous [writing]," and "oral testimony may not be admitted to vary or contradict the terms of a[n unambiguous] document."  Rowley v. Marrcrest Homeowners' Ass'n, 656 P.2d 414, 417 (Utah 1982).  Indeed, this Court has stated that "[i]f the contract is in writing and the language is not ambiguous, the intention of the parties must be determined from the words of the agreement."  Iadanza v. Mather, 820 F. Supp. 1371, 1386 (D. Utah 1993).  See also Maynard v. Wharton, 912 P.2d 446, 449 (Utah Ct. App. 1996) (stating that the final agreement between the parties exemplifies the terms of the agreement and that "all prior terms, whether written or verbal, are extinguished and unenforceable"); Mawhinney v. Jensen, 232 P.2d 769, 774 (Utah 1951) (stating that "a final contract does represent the final meeting of the minds, and in it are merged all the terms expressing the final intentions of the parties and any augmentations," and that "[i]f there are inconsistencies between the terms of the preliminary and final contracts, those of the latter will ordinarily govern").

, and the government hereby agrees at the expiration of this permit to leave the property of the owner in as good condition as it is on the date of the government's entry.

Id. at supplement to ¶ 4.

13.    The Army, by and through Lt. William J. Harrington, executed the agreement, with Jesse Fox Cannon's amendments, on May 25, 1945. See id.

14.    Despite the lack of written permission to bomb the property, the Army went ahead with Project Sphinx as planned.  Commencing on June 21, 1945, and for the next twenty-two days, the Army proceeded to bomb the Cannon Property with nearly every kind of military projectile imaginable at the time, including high explosives and bombs, incendiary weapons, and chemical weapons.  See EE/CA Report, at 2.1.2.2.

15.    The incendiary weapons used on the Cannon Property during Project Sphinx included AVGAS, butane, gasoline, Napalm, PT Jell, and Napalm-gasoline mixtures.  Id.

16.    The chemical weapons used on the Cannon Property included the choking agent phosgene (CG), the blood agent hydrogen cyanide (AC), and blistering agents mustard (H) and distilled mustard (HD).  Each of these chemical agents is deadly and has the potential to take human life in terrible ways.  See id. at 2.1.2.2; 2.4.1; & Table 2-3.

17.    In total, the Army dropped over 3,000 rounds of ammunition containing either chemical or incendiary weapons during Project Sphinx.  The vast majority of these rounds contained chemical weapons.  See id. at Table 2-1.

18.     The Army dropped more than 23 tons of chemical weapons during Project

Sphinx.  See A Memorandum Report: Attack Against Cave-Type Fortifications ("1945 Report"),

at A-55 to A-86 (1945).

19.     In addition to the chemical and incendiary bombs, the Army also dropped a large

amount of conventional-type bombs filled with high explosive material during Project Sphinx.

See Report on Ordnance Impacted upon Cannon Property and Its Relationship to Project Sphinx,

by Kenneth D. Shott ("Shott Report").

20.     The exact tonnage of the conventional bombs dropped during Project Sphinx

appears to be unknown.  Id.

21.     During the testing, and in order to gauge the effectiveness of the particular type of

bomb being dropped onto the Cannons' mines, Army personnel would take into the mines

various types of animals, chiefly goats and rabbits.  The Army personnel would place these

animals at various locations in the mine shafts—some near the entrance, some deeper in the

mine—and would provide some of the animals with gas masks, and leave some of the animals

unmasked.  After depositing the animals in the mines, the Army would then drop various

weapons on the ground near the mine shafts.  Sometimes, the Army concentrated the bombing

near the mine shaft openings, and other times the Army would fire weapons at random onto the

mountains containing the mine shafts.  Still other times, the Cannon Property was subject to

aerial "saturation" bombing.  Some mines would be showered with high explosive bombs.

Others would be subjected to intense incendiary weapon drops.  Still others would be bombarded

with munitions carrying deadly chemical weapons.  After the bombings, the Army would

determine whether the animals left inside the mine shafts had survived the attack.  <u>See</u> 1945

Report, at 6-23, A-55 to A-86; Shott Report.

22.     After the Army's testing ceased in July 1945, Jesse Fox Cannon re-entered his

property, and found that major short-term damage had been done to his mines.  First, he had been

forced to cease mining operations for the several weeks of testing, and second, he found that the

timbering and support of many of the mine shafts had been damaged or destroyed during the

Army's testing.  Jesse Fox Cannon filed two administrative claims against the Army, and

received $755.48 to compensate him for the cessation of operations, and received $2064 to

compensate him for the damage done to the timbering in the mine shafts.  <u>See</u> First and Second

Administrative Claims.

23.     A short time later, it came to Jesse Fox Cannon's attention that chemical weapons

may have been used during Project Sphinx.  Unable to confirm or deny his suspicion that the

Cannon Property had suffered longer-term contamination from the chemical weapons testing,

Mr. Cannon filed a third administrative claim with the Army, this time seeking $5000 in

compensation for longer-term damage done to the property in connection with the chemical

weapons testing.  In 1951, the Army summarily denied this claim, concluding that the property

"is not contaminated with poisonous gases."  <u>See</u> Third Administrative Claim.

24.     A geophysical survey of the Cannon Property and some of the surrounding land

was conducted by Montgomery Watson in the mid-1990s.  Montgomery Watson was hired by the

United States to conduct the geophysical survey.  Montgomery Watson, after searching only

portions of the surface of the Cannon Property, and without even entering the mine shafts themselves, found the following items:

    a.    one 4.2-inch mortar round filled with high explosives;

    b.    four partially intact to intact burster tubes and fuses from M47 100-pound chemical-filled bombs containing remnant amounts of deadly mustard gas;

    c.    three partially intact to intact burster tubes and fuses from 7.2-inch chemical rockets, some of which were still inside burst warhead casings;

    d.    one partially intact burster tube from a 7.2-inch chemical rocket, containing high explosives;

    e.    one 7.2-inch rocket fins, condition unknown;

    f.    other less harmful munitions-related debris, such as burst bomb casings and spent rocket motors.

See EE/CA Report, at 2.3.3.4, 2.3.3.6.

25.    In addition to the ordnance and warfare materiel found on the surface of the searched portions of the Cannon Property, Montgomery Watson researchers discovered a large amount of sub-surface geophysical anomalies within the search grids on the Cannon Property. In some search grids, over 300 anomalies were found. The researchers concluded that "[n]o assumptions can be made as to what percentage of subsurface geophysical anomalies are actually" chemical weapons, unexploded ordnance, or related items. Id. at 2.3.3.2, 2.3.3.3.

26.    Montgomery Watson concluded that, because of "[t]he density of the geophysical anomalies and ordnance-related debris, the presence of [unexploded ordnance] and . . . related items on the surface, and the presence of multiple spent ordnance items," "a relatively higher hazard exists due to [unexploded ordnance or chemical warfare materiel] contamination at the Yellow Jacket Mines [which contain mostly Cannon Property] than at the other investigation areas." Id. at 2.3.3.7.

27.     For the Yellow Jacket Mines portion of the studied property, which portion consists largely of portions of the Cannon Property, the report stated that "[b]ased on the findings of the field investigation and the cost-benefit analysis . . . , Alternative 4 (Acquisition of Mine Claims and Property Titles, Posting Signs, Land Management Plan, Limited Removal Action for [Unexploded Ordnance and Chemical Warfare Materiel], and Mine Sealing) is the recommended removal action alternative." Id. at 6.1.0.3.

28.     Montgomery Watson, as part of its "cost analysis," rejected the only one of the five alternatives that included clean-up of the property—Alternative 5—because of cost concerns.  Montgomery Watson estimates that it would cost approximately $12,300,000 for "Full-Scale Removal" of the unexploded ordnance, chemical warfare materiel, and other munitions-related debris in the Yellow Jacket Mines area of the surveyed property. See id. at 4.3.5, Table 4-11, Table 5-1.

29.     The Yellow Jacket area of the surveyed property consists of only 125 acres, and contains portions of only 5 of the Cannons' 87 patented claims. See id. at Table 4-11, Table 2-2.

30.     Since 1996, the United States has taken no action associated with the conclusions of the EE/CA Report.  The United States has not taken any action to clean up the property or to compensate the Cannons; in fact, the United States has, "due to funding constraints," never even issued a final version of the EE/CA Report. See Enloe Depo., at 8-10.

## ARGUMENT

### THE CANNONS' CLAIMS AGAINST THE UNITED STATES
### ARE NOT BARRED BY THE DISCRETIONARY FUNCTION EXCEPTION

By the instant motion, the United States contends that the Cannons' claims against it are

barred by the "discretionary function exception" to the Federal Tort Claims Act (FTCA). This

argument—indeed, the entire motion—is yet another attempt by the United States to avoid

compensating the Cannons for the damage it has wreaked on their property over the last 56 years.

The instant motion is without merit, for the simple reason that the United States and its

employees *had no discretion* to drop bombs on the Cannon Property and then fail to clean up the

mess left by the bombing. Where the United States and its employees *have no discretion* to take

(or fail to take) a particular course of action, the "discretionary function exception" to the FTCA

cannot, by definition, apply at all. For this and other reasons, as discussed below, the United

States' current motion must fail.

### A.       This Court's Standard of Review

As an initial matter, the United States claims that its motion is a motion to dismiss under

Fed. R. Civ. P. 12(b)(1). This is true in one respect, because, as the United States correctly

points out, its motion goes to this Court's subject matter jurisdiction to hear this case. See SK

Finance SA v. LaPlata County Board of County Comm'ners, 126 F.3d 1272, 1275 (10th Cir.

1997). However, the United States fails to point out to this Court that this particular Rule

12(b)(1) motion must be treated as a motion for summary judgment "if the jurisdictional question

is intertwined with the merits of the case." See Franklin Savings Corp. v. United States, 180

F.3d 1124, 1129 (10th Cir.), cert. denied, 528 U.S. 964 (1999). The Tenth Circuit has held, on

numerous and recent occasions, that the court "**must** convert a Rule 12(b)(1) motion" to a Rule 56 motion for summary judgment if (1) the "jurisdictional question is intertwined with the merits of the case," and (2) the court considers matters outside the pleadings.  See id. (emphasis added); see also Bell v. United States, 127 F.3d 1226, 1228 (10th Cir. 1997); Tippett v. United States, 108 F.3d 1194, 1196 (10th Cir. 1997); Redmon v. United States, 934 F.2d 1151, 1155 (10th Cir. 1991).

In this case, the jurisdictional issues surrounding the United States's current motion are inextricably linked with the issues surrounding the merits of this case.  The same documents and issues that must be examined to determine this Court's subject matter jurisdiction under the discretionary function exception must also be examined in order to determine the United States' liability on the merits of this case.  See Exhibits.  Thus, the United States' motion is properly viewed as a motion for summary judgment pursuant to Fed. R. Civ. P. 56.[3]

At the summary judgment stage, Rule 56(c) allows entry of summary judgment only "if the pleading, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  The party seeking summary judgment has the burden of showing "that there is no genuine issue of material fact."  WKB Enters., Inc. v. Ruan Leasing Co., 838 F. Supp. 529, 532 (D. Utah 1993).  Furthermore, "[i]n reviewing the evidence

---

[3] Indeed, the United States appears to treat its motion as a summary judgment motion rather than as a motion to dismiss, in that it has submitted a brief with sixteen (16) pages of legal argument without asking leave of this Court to file an overlength memorandum.  Such a memorandum would be impermissibly overlong were it really a memorandum in support of a motion to dismiss, see D.U.Civ.R. 7-1(b)(3), but would be entirely permissible as a memorandum in support of a motion for summary judgment, see D.U.Civ.R. 56-1(b).

presented, the court is to construe all facts, and reasonable inferences therefrom, in favor of the non-moving party." Id. "For purposes of summary judgment, this court does not weigh the evidence. Instead, the court examines the evidence to determine if a reasonable jury could return a verdict in favor of the nonmoving party. If it can, summary judgment should be denied." Id.

### B.    The Discretionary Function Exception

Prior to 1946, citizens who felt that they had been tortiously wronged by the United States or by a federal employee were categorically barred from suing the United States for redress, because, "[u]nder the historic English common law maxim . . . 'the King can do no wrong,' a sovereign was immune from liability." See Figueroa v. United States, 64 F. Supp.2d 1125, 1129 (D. Utah 1999). The only avenue open to such citizens was "to have a private claim bill presented in and passed by Congress and signed into law by the President." Id. In response to criticism that this procedure was unwieldy and partisan, and "after nearly thirty years of consideration," Congress passed the FTCA in 1946. Id. at 1129-30. "As understood by the Supreme Court, the adoption of the FTCA was the 'offspring of a feeling that the Government should assume the obligation to pay damages for the misfeasance of employees carrying out its work.'" Id. (quoting Dalehite v. United States, 346 U.S. 15, 24-30 (1953)). The FTCA "partially ameliorated traditional sovereign immunity by imposing responsibility on the United States for its negligent conduct." Id.

The FTCA's waiver of federal sovereign immunity is only partial, because Congress provided for "thirteen enumerated exceptions [to the FTCA] found in 28 U.S.C. § 2680." Id. The Tenth Circuit has stated on multiple occasions that these thirteen "exceptions to the FTCA

are to be narrowly construed." See Johnson v. United States Dep't of Interior, 949 F.2d 332, 336

(10th Cir. 1991) (quoting Miller v. United States, 710 F.2d 656, 662 (10th Cir. 1983)).  This Court

has noted that narrow construction of these exceptions is necessary in order to avoid

"eviscerat[ion] of the laudatory purposes of the FTCA." See Figueroa, 64 F. Supp.2d at 1130;

see also Duke v. United States Dep't of Agric., 131 F.3d 1407, 1411 (10th Cir. 1997) (stating that

courts must interpret the FTCA's exceptions in a manner that would not "allow the exception[s]

to swallow the FTCA's sweeping waiver of sovereign immunity").

     One of these thirteen enumerated exceptions is known as the "discretionary function

exception," and provides as follows:

> [The waiver of sovereign immunity] shall not apply to . . . [a]ny claim . . . based
> upon the exercise or performance or the failure to exercise or perform a
> discretionary function or duty on the part of a federal agency or an employee of
> the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a).  "Under United States Supreme Court case law, whether the discretionary

function exception should be applied is to be determined under a two-step analysis." See

Figueroa, 64 F. Supp.2d at 1131.  The first step involves an examination of the "nature of the

challenged [governmental] conduct," and includes a consideration of "whether the action is a

matter of choice for the acting employee." See Berkovitz v. United States, 486 U.S. 531, 536

(1988).  If the challenged conduct does not involve "an element of judgment or choice," it cannot

be discretionary. Id.  Thus, if "a federal statute, regulation, or policy specifically prescribes a

course of action for an [governmental] employee to follow," the governmental employee is duty-

bound to follow that course of action and has no discretion to deviate therefrom. Id.  In such a

situation, there is no discretion, and, therefore, the discretionary function exception cannot apply.

If, however, it is determined that the challenged action involved an element of judgment, the court must then "determine whether that judgment is of the kind that the discretionary function exception was designed to shield." Id. This part of the test is designed to shield activities "based on considerations of public policy," see id., but is not designed to shield other, more minor non-policy actions, such as a federal employee's negligent operation of a vehicle, see United States v. Gaubert, 499 U.S. 315, 325 n.7 (1991).

In order to demonstrate that this case falls within the discretionary function exception, the United States must show that **both** parts of the two-part Berkovitz test are met. See Gaubert, 499 U.S. at 322-23; see also Horta v. Sullivan, 4 F.3d 2, 17 (1st Cir. 1993) (stating that "[i]f both elements are present, then the discretionary function exception applies"). If either of the two parts of the test are not met, then the discretionary function exception does not apply. In this case, neither element is met.

**1.     The United States had a specific mandatory duty to restore the Cannon Property to its original condition, and therefore had no discretion to refuse to clean up the Cannon Property.**

In this case, the Cannons are challenging government action that is not protected by the discretionary function exception because, for two related reasons, the United States and its employees had no discretion to bomb the Cannon Property and then fail to clean up the mess resulting from the bombing. First, the United States was bound, by contract with Jesse Fox Cannon, to return the Cannon Property to the condition it was in on the date of the United States' entry onto the property. Second, it appears well-settled that the United States can never have discretion to trespass on the property of its own citizens. For these reasons, neither the United

States nor any of its employees ever had any discretion to fail to restore the Cannon Property to
its original condition.  The United States' blatant failure to follow its mandatory duty did not
involve even a modicum of discretion, and therefore is not protected by the "discretionary"
function exception.

> a.     *The United States was bound by contract to restore the Cannon*
>        *Property to its original condition, and had no discretion to do*
>        *otherwise.*

The United States Supreme Court has stated that "if the [federal] employee's conduct
cannot appropriately be the product of judgment or choice, then there is no discretion in the
conduct for the discretionary function exception to protect."  See Berkovitz, 486 U.S. at 536.
The Berkovitz Court gave several examples of situations in which a federal employee has no
discretion, to wit, where "a federal statute, regulation, or policy specifically prescribes a course of
action for the employee to follow."  Id.  Lower courts applying the FTCA have given several
other examples.  For instance, a federal employee's discretion can be cabined by objective
standards governing a certain profession or field, see, e.g., Ayala v. United States, 980 F.2d 1342,
1348-51 (10th Cir. 1992) (holding that objective engineering standards governing lighting in
mines did not allow room for any discretion); Jackson v. Kelly, 557 F.2d 735, 737-39 (10th Cir.
1977) (holding that objective medical standards governing physicians did not allow room for
discretion under the exception), or by common law principles, see, e.g., Smith v. United States,
546 F.2d 872, 877 (10th Cir. 1976) (holding that the United States' common-law duties as a
landowner prescribed the proper course of activity); see also 2 Lester S. Jayson, Handling Federal
Tort Claims: Administrative and Judicial Remedies § 12.06[10], at 12-128 (2000) (stating that

"when the common law imposes a duty on the United States in its capacity as a landowner to warn an invitee of known dangers on the premises, it has been held that the discretionary function exception is not defense to an action based on failure to warn," and citing cases).

In addition to statutes, regulations, objective standards, and common-law mandates, *federal contractual obligations* can also create mandatory specific duties.  Indeed, the Tenth Circuit has plainly stated that "**[c]ourts have recognized that the government's voluntarily assumed contractual obligations can impose nondiscretionary duties on government employees**."  See Bell v. United States, 127 F.3d 1226, 1229 (10th Cir. 1997) (emphasis added); see also Kiehn v. United States, 984 F.2d 1100, 1106 (10th Cir. 1993) (stating that the United States "was required by contract" to provide emergency assistance and that "[i]f Kiehn's claim was that the NPS was negligent in failing to provide emergency medical service, then clearly his claim would not be barred by the discretionary function exception").  Courts across the country have reached the same conclusion, and have held that federal employees have no discretion to act contrary to federal contractual obligations.  See, e.g., Andrews v. United States, 121 F.3d 1430, 1441 (11th Cir. 1997) (stating that "under its contracts . . . , the Navy had a mandatory duty to segregate waste" and, therefore, "the discretionary function exception does not insulate the government from liability under the FTCA for damages that resulted from the Navy's failure to segregate waste"); Kennewick Irrigation Dist. v. United States, 880 F.2d 1018, 1026 (9th Cir. 1989) (stating that "discretion may be removed if the government incorporates specific safety standards in a contract which imposes duties on the government's agent"); Pelham v. United States, 661 F. Supp. 1063, 1072-73 (D.N.J. 1987) (stating that "[u]nder the contract, there is

nothing discretionary about th[e government's] responsibility" to enforce compliance with safety standards).

In this case, the United States had a specific mandatory duty, under its written and binding contract with Jesse Fox Cannon, to "leave the property of the owner in as good condition as it is on the date of the government's entry." <u>See</u> Construction Survey & Exploration Permit, dated May 25, 1945, at supplement to ¶ 4.[4] It is **undisputed** that the United States failed, and continues to fail, to comply with this mandatory contractual duty—the Cannon Property is, even today, littered with exploded and unexploded munitions of various types, and the United States has done nothing, for 56 years, to clean up its mess. The United States and its employees had (and have) no discretion to fail to act in accordance with the contract. That is, the United States has no discretion to fail to clean up the mess it left on the Cannon Property. To paraphrase the Eleventh Circuit, the United States had a mandatory contractual duty to clean up the Cannon Property, and, therefore, the discretionary function exception does not insulate the United States

---

[4] The United States argues in its memorandum that, to the extent the Cannons' claim is "based upon an alleged violation of the United States of the contract between Mr. Jesse Cannon and the United States in 1945, that claim must fail" because, asserts the United States, this Court would not have subject matter jurisdiction over such a claim. <u>See</u> United States' Memorandum, at 17. The United States, by making this contention, demonstrates a misunderstanding of FTCA case law as well as of the Cannons' claims. As discussed above, a mandatory duty can arise from a contractual obligation, and, in some cases, failure to comply with that contractual duty can result in tortious injury actionable under the FTCA. <u>See</u>, <u>e.g.</u>, <u>Bell</u>, 127 F.3d at 1229; <u>Andrews</u>, 121 F.3d at 1441; <u>Kennewick</u>, 880 F.2d at 1026. The United States is correct that a claim for breach of contract against the United States for more than $10,000 falls under the Tucker Act, and must be brought in the Court of Federal Claims. <u>See</u> 28 U.S.C. §§ 1346(a)(2), 1491. But the Cannons are not bringing a claim for breach of contract; rather, the Cannons' claims sound in tort, and are actionable under the FTCA even though (and, as it turns out, precisely because, <u>see</u>, <u>e.g.</u>, <u>Bell</u>, 127 F.3d at 1229) their claims reference the United States' failure to comply with its contractual obligations.

-8-

from liability under the FTCA for damages that resulted from its failure to clean up the property.

See Andrews, 121 F.3d at 1441.

> b. *The United States had no discretion to commit a trespass on the Cannon Property.*

Moreover, the United States was without discretion to bomb the Cannon Property and

then fail to clean up the mess, because "[t]he Government . . . has no discretion to commit illegal

acts." See 2 Lester S. Jayson, Handling Federal Tort Claims: Administrative and Judicial

Remedies § 12.06[8][c], at 12-116 (2000). Indeed, the United States Supreme Court has stated

flatly that the discretionary function exception cannot aid the United States in a trespass case,

because in such cases the acts complained of are "wrongful trespasses not involving discretion on

the part of the [government] agents." Hatahley v. United States, 351 U.S. 173, 181 (1956).

Several circuits have followed the Supreme Court's lead, and have held that the discretionary

function exception is "of no avail to the Government" in a trespass case, because "the

Government has no authority or discretion over land not under its control." Simons v. United

States, 413 F.2d 531, 534 (5th Cir. 1969); see also Payne v. United States, 730 F.2d 1434, 1437

(11th Cir. 1984) (citing Hatahley, and stating that "the federal agents were not performing a

discretionary function or duty in committing a wrongful trespass").

As the Cannons have pointed out in their memorandum in support of their Motion for

Partial Summary Judgment as to Liability, no matter which way certain factual disputes are

resolved by this Court, one way or the other the United States has committed, and indeed

continues to commit, a trespass upon the Cannon Property. Under Utah law, a trespass can be

committed either by (1) wrongfully entering on another person's property, or (2) by failing to

488230v1                                    -9-

remove from another person's land a thing which that person is under a duty to remove.  <u>See</u>

Restatement (Second) Torts, §§ 158, 160, 161; <u>see also</u> <u>U.P.C., Inc. v. R.O.A. General, Inc.</u>,

1999 UT App 303, ¶41 & n.5, 990 P.2d 945, 955 n.5 (holding that a party who has permission to

use the property of another, but has a contractual duty to "restore the premises to their former

condition" but does not do so, has committed a trespass).  Whether the trespass in this case

consisted of the United States' wrongful entry onto the Cannon Property, or of the United States'

wrongful failure to clean up the Cannon Property after the bombing, or both, either way the

United States committed a trespass.  And either way, the United States was without discretion to

commit such an act.

Under these circumstances, both because of the United States' contractual duty to remove

the munitions, and because the United States can never have discretion to commit a trespass, the

United States did not have any discretion to commit the wrongs it committed on the Cannon

Property.  Therefore, the first part of the <u>Berkovitz</u> test is not met, and the discretionary function

exception to the FTCA cannot aid the United States in its ongoing efforts to avoid compensating

the Cannons.  This alone is enough to defeat the United States' current motion.

> **2.     The United States' decision to refuse to clean up the Cannon Property
> is not the type of decision that the discretionary function exception
> was designed to shield.**

The second part of the <u>Berkovitz</u> test is also not met here, because the United States'

decision to bomb the Cannon Property and then refuse to clean up the mess is not the type of

decision that the discretionary function exception was designed to shield.  As discussed above,

the discretionary function exception was designed to shield activities "based on considerations of

488230v1                                                          -10-

public policy," see Berkovitz, 486 U.S. at 536, but is designed to allow suits challenging the exercise of other, more minor non-policy actions, such as a federal employee's negligent operation of a vehicle, see United States v. Gaubert, 499 U.S. 315, 325 n.7 (1991).  The Tenth Circuit has stated that the burden is upon the government to show that its actions "implicated 'political, social, or economic decisions of the sort that the exception was designed to protect.'" See Duke, 131 F.3d at 1412 (citation omitted); see also Franklin Savings Corp., 180 F.3d at 1135 (stating that the Supreme Court, in Gaubert, had "lightened the Government's burden" under the second part of the Berkovitz test, but stating nonetheless that the burden falls upon the Government).  In this case the United States has failed to meet this burden.

The United States argues that its decision to conduct military tests in preparation for invasion of the Japanese home islands was the type of decision that the discretionary function was designed to protect.  See United States' Memorandum, at 12-13.  In many cases, some of which have been cited by the United States, courts have held that military testing decisions are discretionary and grounded in public policy.  See, e.g., Aragon v. United States, 950 F. Supp. 321, 325 (D.N.M. 1996), aff'd, 146 F.3d 819 (10th Cir. 1998).  However, the United States' argument overlooks two important distinctions between those cases and the instant case.

First, in each of those cases, the United States conducted its military tests *on United States government lands*.  In none of those cases did the United States enter upon **private property** to conduct the military testing.  In this case, because the United States is the movant on this motion, all facts must be viewed in the light most favorable to the Cannons, and, therefore, it must be assumed that Jesse Fox Cannon did not give written or oral permission for the United

States to drop bombs on his property. See Factual Background, at ¶¶ 9-13. While it is certainly

in the national interest for the United States to conduct military testing during wartime, that right

does not extend so far as to allow the United States to enter onto the private property of its

citizens and, possibly without permission, drop tons and tons of bombs on the private property.

The discretionary function exception may have been intended to allow the government to

conduct nearly any type of military tests on its own property, see Aragon, 146 F.3d at 826; Allen

v. United States, 816 F.2d 1417 (10th Cir. 1987),[5] but it was certainly not intended to protect

government decisions to wrongfully, and without permission, enter onto the property of its

citizens to drop bombs, see Hatahley, 351 U.S. at 181 (stating that the discretionary function

exception cannot aid the United States in a trespass case, because in such cases the acts

complained of are "wrongful trespasses not involving discretion on the part of the [government]

agents"); Simons, 413 F.2d at 534 (stating that the discretionary function exception is "of no

avail to the Government" in a trespass case, because "the Government has no authority or

discretion over land not under its control").

---

[5] This case is readily distinguishable from the Allen case. As discussed above, in Allen the
nuclear testing was conducted on United States government property in Nevada; there was no
allegation in Allen that the United States had conducted weapons testing on private land or had
otherwise trespassed on private property. See Allen, 816 F.2d at 1417. Furthermore, in Allen,
the United States was not bound by contract to clean up its mess or otherwise remediate the
damages it had caused. Both of these determinative elements, missing from the Allen case, are
present here. Certainly, had the Allen plaintiffs been complaining of nuclear testing conducted
on their own private property, or had the Allen plaintiffs had a written contract with the United
States under which the United States had a mandatory duty to remediate any damages, the Allen
case undoubtedly would have turned out differently.

Second, even assuming that the United States did in fact have some type of permission to enter the property and bomb it, in this case the United States had a mandatory and affirmative contractual duty to clean up the mess it created as a result of the bombing. See Construction Survey & Exploration Permit, dated May 25, 1945, at supplement to ¶ 4. Whatever the parameters of the discretionary function exception, it cannot be construed to stretch far enough to protect the decision of the United States to willingly breach its contracts with its citizens. After bombing the Cannon Property, the United States made the decision to refuse to clean up its mess, despite its contractual obligation to do otherwise, and this decision cannot possibly be the type of policy-based decision that the discretionary function exception was designed to protect.

In short, the United States' decisions to (1) enter the Cannons' private property and, without permission, drop bombs thereon and (2) refuse, for 56 years, to clean up the mess it left on the Cannon Property, as it was contractually obligated to do, are not actions that implicate "'political, social, or economic decisions of the sort that the exception was designed to protect.'" See Duke, 131 F.3d at 1412 (citation omitted). The United States carries the burden of demonstrating that its decisions were the type that the discretionary function exception is designed to protect, and it has utterly failed to carry this burden.

## CONCLUSION

In the end, the United States' latest effort to avoid liability must fail like the others. The discretionary function exception simply does not apply to this situation, where the United States and its employees were bound to follow a particular course of action. There was no discretion involved for the discretionary function exception to protect, because the United States was under

488230v1                                      -13-

a mandatory duty to, *inter alia*, clean up the Cannon Property after the bombing.   Furthermore,

the discretionary function exception was not intended to shield the United States from liability

for wanton trespasses and willful breaches of contract.   For all the foregoing reasons, the United

States' motion should be denied.

DATED this ___4th___ day of May, 2001.

JONES, WALDO, HOLBROOK & McDONOUGH

By_____

Anthony L. Rampton
Ryan M. Harris
*Attorneys for Margaret Louise Cannon and*
*Allan Robert Cannon*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 4th day of May, 2001, I caused a true and correct

copy of the **MEMORANDUM IN OPPOSITION TO MOTION OF THE UNITED STATES**

**TO DISMISS** to be sent, via the following means, to the following:


**VIA FACSIMILE AND OVERNIGHT MAIL**:

        Gay Elizabeth Kang
        Trial Attorney
        United States Department of Justice
        Civil Division/Torts Branch
        P.O. Box 340
        Washington, D.C.  20044
        Fax No. (202) 616 4989


**VIA FIRST CLASS U.S. MAIL**:

        Melvin E. Leslie
        4444 South 700 East, #203
        Salt Lake City, Utah 84107
        Fax No. 281 1724

        Daniel Price
        Assistant U.S. Attorney
        United States Attorney's Office
        185 South State Street, Suite 400
        Salt Lake City, Utah  84111