FILED
CLERK, U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

-1 FEB 02 PM 3:51

DISTRICT OF UTAH

BY:_____
DEPUTY CLERK

\* \* \* \* \* \* \* \* \*

| | |
|---|---|
| MARGARET LOUISE CANNON and ALLAN ROBERT CANNON, as individuals, | ) ) ) |
| Plaintiffs, | ) ) ) |
| vs. | ) ) ) |
| UNITED STATES OF AMERICA, | ) ) ) |
| Defendant. | ) ) |

Civil No. 2:98-CV-0882J

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

\* \* \* \* \* \* \* \* \*

This matter came before this Court for a trial on damages on January 8–10, 2002. The trial was limited to matters related to damages, in light of this Court's Order granting Plaintiffs' Motion for Partial Summary Judgment as to Liability. At the trial, Anthony L. Rampton and Ryan M. Harris were present on behalf of Plaintiffs Margaret Louise Cannon and Allan Robert Cannon ("Plaintiffs" or "the Cannons"); Gay Elizabeth Kang, J. Charles Kruse, and Kirsten L. Wilkerson were present on behalf of Defendant United States of America. Now, having considered the evidence, the applicable law, the arguments of counsel, Plaintiffs' proposed findings and Defendants' objections and supplemental findings, the Court enters the following findings of fact and conclusions of law:

## FINDINGS OF FACT

1.   The Cannons are 75% owners of 86½ patented mining claims ("the Cannon Property"), encompassing 1416.76 acres of real property, in the Dugway mountain range in

127

Tooele County, Utah. The Cannon Property is located immediately south and east of the United States Government's Dugway Proving Ground military installation.

2. In 1945, the United States Army was permitted to use the Cannon Property for military weapons testing, including chemical, incendiary, and conventional high-explosive weapons. A "Construction, Survey & Exploration Permit" was signed by Plaintiffs' grandfather Jesse Fox Cannon on May 25, 1945, allowing the United States' use of the property. A provision of the contract specified that the government "leave the property in as good condition as it is on the date of the governments entry."

3. The United States has not restored the Cannon Property to its original condition, and this Court has entered an Order finding that a continuing trespass and nuisance exists on the property.

4. The ordnance contamination occurred in 1945, during World War II, under a United States Army ordnance test program called "Project Sphinx." In this test program, the United States Army bombed the Cannon Property with high explosives and bombs, incendiary weapons, and chemical weapons.

5. The incendiary weapons used on the Cannon Property during Project Sphinx included AVGAS, butane, gasoline, Napalm, PT Jell, and Napalm-gasoline mixtures.

6. The chemical weapons used on the Cannon Property during Project Sphinx included the choking agent phosgene (CG), the blood agent hydrogen cyanide (AC), and blistering agents mustard (H) and distilled mustard (HD).

7. In total, the Army dropped over 3,000 rounds of ammunition containing either chemical or incendiary weapons during Project Sphinx. A majority of these rounds contained

chemical weapons. In total, the Army dropped more than 23 tons of chemical weapons during Project Sphinx.

8. In addition to the chemical and incendiary bombs, the Army also dropped conventional-type bombs filled with high explosive material during Project Sphinx. These included the 12,000 pound Fall Boy bombs, Tiny Tim rockets, and other types of high explosive munitions.

9. Some bombs dropped fell either short or long of their intended targets, one bomb missed by up to a mile. Some bombs hit near the intended target, and then ricocheted away to another location.

10. On July 13, 1994, the United States Army sent an access agreement to Margaret Louise Cannon and Allan Robert Cannon, respectively. On July 28, 1994, the United States Army sent an access agreement to Floyd Douglas Cannon. In each agreement, the United States Army stated that the purpose was "to determine whether or not these lands have been impacted by unexploded ordnance. According to our records, you own property included in the survey area."

11. On August 3, 1994, Margaret Louise Cannon attended a Public Availability Session by the United States Army Corps of Engineers and obtained "Fact Sheets" that noted potential ordnance contamination in the Dugway Mountain Range.

12. In 1996, Montgomery Watson, a contractor retained by the United States, completed a draft "Engineering Evaluation/Cost Analysis" ("EE/CA") on Project Sphinx impact for the Yellow Jacket Ranges in the Dugway Mountains. A portion of the Cannon property at issue in the case falls within the area studied by the EE/CA. The contractor studied areas near

three of the Army's 1945 target sites. Montgomery Watson did not examine the land outside the vicinity of the three target sites.

      13.    Two of the target areas selected included portions of the Cannon Property; the third did not. In all, Montgomery Watson examined portions of only 5 of the Cannons' 86½ mining claims.

      14.    The EE/CA revealed the presence of the following items on the studied portions of the Cannon Property:

      a.    one 4.2-inch mortar round filled with high explosives;
      b.    four partially intact to intact burster tubes and fuses from M47 100-pound chemical-filled bombs containing remnant amounts of mustard gas;
      c.    three partially intact to intact burster tubes and fuses from 7.2-inch chemical rockets, some of which were still inside burst warhead casings;
      d.    one partially intact burster tube from a 7.2-inch chemical rocket, containing high explosives;
      e.    one 7.2-inch rocket fins, condition unknown;
      f.    other less harmful munitions-related debris, such as burst bomb casings and spent rocket motors.

One of these items—the 4.2 inch mortar round—was still capable of exploding. In addition to the ordnance and warfare materiel found on the surface of the searched portions of the Cannon Property, researchers discovered a large amount of sub-surface geophysical anomalies within the search grids on the Cannon Property. In some search grids, over 300 anomalies were found. Montgomery Watson was unable to say with certainty what these anomalies represented, whether ordnance related or related to ferrous rock or other material.

      15.    The Montgomery Watson EE/CA noted a 1993 United States risk assessment study, wherein the United States had assigned a "catastrophic" hazard severity rating to the

portion of the land studied in the EE/CA.

16. The EE/CA discussed five possible alternatives for the studied lands:

a. Alternative 1–No Further Action;
b. Alternative 2–Fencing, Posting Signs, Public Awareness, Training, and Land Management Plan;
c. Alternative 3–Acquisition of Mine Claims and Property Titles, Fencing, Posting Signs, and Land Management Plan;
d. Alternative 4–Acquisition of Mine Claims and Property Titles, Fencing, Posting Signs, Land Management Plan, Limited Removal Action for [Unexploded Ordnance and Chemical Warfare Materiel], and Mine Sealing;
e. Alternative 5–Full-Scale Removal of [Unexploded Ordnance and Chemical Warfare Materiel] and Mine Clearance.

17. Montgomery Watson hired Mr. Robert Osterstock, an experienced, independent geologist, to value the patented mining claims on the portion of the lands studied by the EE/CA. Mr. Osterstock valued the combined surface and mineral interests at $160 per acre as of October 11, 1995.

18. The cost of implementing Alternative 4 was estimated to be $1,830,000—the cost of purchasing the property for $160 per acre, conducting a limited removal of munitions and debris from the studied lands, sealing the mines on the studied lands, posting signs, etc.

19. The cost of implementing Alternative 5 was estimated to be $12,703,000—the cost of conducting a full-scale removal of the munitions and debris from the studied lands, and clearing the mines located in the studied lands.

20. After evaluating the findings, and the estimated costs of the various proposed alternatives, Montgomery Watson recommended that Alternative 4 be selected as the preferred alternative.

21. The evidence clearly shows that the studied portions of the Cannon Property are

not the only areas affected by the United States's military exercises in Project Sphinx. Metal fragments and other munitions-related debris appear to exist throughout other portions of the Cannon Property.

22. To date, the United States has taken no action beyond the EE/CA activity to clean up the munitions and ordnance-related debris still extant on the Cannon Property. A representative of the U.S. Army Corps of Engineers stated that, if several variables (e.g., Congressional funding, etc.) remain as they currently stand, plans to begin cleaning up the studied portions of the Cannon Property could begin in 2007. The United States apparently has no present plans to clean up the portion of the Cannon Property that was not included in the EE/CA.

23. Members of the general public use the Cannon Property occasionally, for camping, hiking, hunting, and other recreational pursuits. There is some risk that citizens may become injured by the military ordnance still present on the Cannon Property.

24. In 1985, the estate tax return for Plaintiffs' father, Dr. J. Floyd Cannon, was examined by the Internal Revenue Service ("IRS") for possible allegations of civil tax fraud against the beneficiaries of the estate, including Plaintiffs. The IRS was concerned that the Cannons had undervalued certain mining claims in western Utah, including the mining claims on the Cannon Property.

25. At trial, Plaintiffs submitted two appraisals concerning the Cannon Property, both conducted on behalf of the IRS in 1986, one by Mr. R.A. Wood, and the other by Mr. Leon Hansen. The IRS maintained that these appraisals furnished clear and convincing evidence that the Cannons had undervalued the Cannon Property properties reflected in the estate tax return.

26.     Mr. Wood's opinion was that the Cannon Property was worth $560,980. Mr. Hansen's opinion was that the Cannon Property was worth $466,867. Neither Mr. Wood nor Mr. Hansen took into account the effect of any ordnance contamination on the value of the property.

27.     Plaintiffs' witness, Mr. Gail Anger, the former IRS Appeals Officer who handled the Cannon protest of the IRS examination of the estate tax return of Dr. J. Floyd Cannon, testified that both appraisals were entitled to little or no weight because each of the appraisers had his own agenda rather than constituting a valid appraisal.

28.     Mr. Anger testified that personal representatives of the Cannon estate hired two appraisers in 1987, Mr. Samuel Arentz and Mr. M.K. McCarter. Mr. Arentz found that the mineral rights in the Cannon Dugway property had no value as of the date of Dr. Cannon's death in 1980; he listed the surface value of the Cannon Dugway property at $13,449.05. Mr. McCarter did not feel qualified to render an opinion on the surface value, but based his knowledge of mining assigned no value to the mineral rights and commented that the deposits would be marginal if in fact they were economic at all.

29.     Defendant submitted a 1999 appraisal of the Cannon Dugway property at issue by Mr. John Widdoss. Mr. Widdoss concluded that the Cannon Dugway property consisting of 1416.76 acres was worth $250,000. Mr. Widdoss did not take into account the effect of any ordnance contamination on the value of the property.

30.     Plaintiffs' witness, Mr. Richard Klatt, worked for the mining company Gold Standard, Inc. as their Mining Exploration Manager. In 1989, he wrote Congressmen to request that the United States not withdraw property in the Dugway Mining District despite notice of potential ordnance contamination. Gold Standard leased the Cannon property within the Dugway

Mining District from 1988 to 1992. Mr. Klatt testified that Gold Standard terminated the lease due to lack of indicated presence of ore deposits of sufficient commercial economic interest. He also noted that the presence of unexploded ordnance would be a serious impediment to any efforts Plaintiffs might make to market the property.

31. Margaret Louise Cannon filed an application for acquiring 20 additional mining claims in the Dugway Mining District in June of 1996.

32. Defendant's expert, Mr. Widdoss, stated that the presence of unexploded ordnance would negatively affect the value of the Cannon Property, but would not deter mining companies from leasing or exploring the property.

33. The Cannons earned $246,000 from leases of the Cannon Dugway mining properties over the course of 1969 to 1993.

34. All three owners of the Cannon Property testified their opinion that the current value of the Cannon Property is zero, after taking into account the effect of the presence of unexploded ordnance on the market value of the property.

35. However, when asked by the Court, Plaintiffs indicated that they wanted to keep the property, and that it had some value to them in that regard.

## CONCLUSIONS OF LAW

*The Appropriate Measure of Damages*

1. The measure of damages to be applied in this case is diminution in value, not restoration costs. Under Utah law, which applies here, see Flynn v. United States, 902 F.2d 1524, 1527 (10th Cir. 1990), generally the cost of restoration may only be used as the measure of damages where such costs do not exceed the market value of the land. Ault v. Dubois, 739 P.2d

1117, 1120 (Utah Ct. App. 1987). In this case, restoration costs far exceed the market value of the Cannon Property.

2. Here. Plaintiffs introduced evidence of the amount of money it would take to clean up only one corner of the Cannon Property, and that amount exceeds, by any measure, the full value of the Cannon Property. Where a plaintiff gives evidence as to the restoration costs of a parcel of damaged property, "it is up to the defendant to show that the other measure of damages would be less," and the "defendant had [the] burden to present evidence of diminution in value." Id.

3. Both Plaintiffs and Defendant presented evidence of diminution in value. The figures presented by both sides are less than the restoration costs. Therefore, Defendant has met its burden of showing that diminution in value is less than restoration costs. Diminution in value is the measure of damages to be applied in this case.

4. Under Utah law, diminution in value is measured by the difference in the value of the property immediately before and immediately after the injury resulting from the trespass. See Thorsen v. Johnson, 745 P.2d 1243, 1244–45 (Utah 1987).

5. Plaintiffs presented evidence of value based on two appraisals done by the Internal Revenue Service in 1986. According to these appraisals, the Cannon Property was worth $560,980 or $466,867 without taking into account the ordnance contamination.

6. Defendant presented evidence of value based on an appraisal done by Mr. Widdoss in 1999. Mr. Widdoss placed the value of the Cannon Property at $250,000, also without taking into account the ordnance contamination.

7. After considering and weighing this evidence, this Court determines that the

appraisal submitted by Defendant is the more credible valuation. Therefore, the Court adopts the fair market value of the Cannon Property as $250,000, or $176.46 per acre.

8. Under Utah law, owners of property may offer their opinion as to the worth of the property. See ProMax Dev. Corp. v. Mattson, 943 P.2d 247, 258 (Utah Ct. App. 1997). However, a court is not bound by that valuation.

9. Plaintiffs presented evidence, through all three owners of the property, that the current value of the Cannon Property is zero.

10. Defendant argued that the Cannon Property lacked economically feasible, commercial mineral resources and showed a demonstrated low marketability without consideration of ordnance contamination. Defendant conducted vigorous cross-examination of Plaintiffs with respect to the value of the property, historical mining operation on the property, and other related topics.

11. On balance, after weighing the evidence presented, the Court finds that the value of the Cannon Property has been diminished. However, the Court finds that, in light of Plaintiffs' indication that they would like to keep the property, the Cannon Property does retain some residual value, and that its current value is higher than zero.

12. After weighing the evidence and testimony presented, and listening to what has been offered, it is the conclusion of the Court that the Cannon Property retains a market value of $25 per acre, taking into account the military ordnance now found upon it.

***Diminution in Value***

13. In this case, that diminution in value amounts to $151.46 per acre, the difference between the fair market value of $250,000 based upon $176.26 per acre and the $25 per acre

value adopted by the court is reasonable under the circumstances. Thus, the total diminution in value to the Cannon Property resulting from Defendant's continuing trespass is $214,582.47.

14. Plaintiffs own 75% of the Cannon Property, and therefore the market value of their property interests has been diminished by $160,936.85.

*Noneconomic Damages*

15. The Court finds that Plaintiffs' failure to first present a claim for noneconomic damages to the appropriate federal administrative agency prevents the Court from awarding Plaintiffs any such damages in this proceeding for want of jurisdiction under 28 U.S.C. 2675(a).

Let judgment be entered accordingly.

DATED this ___ day of February, 2002.

BY THE COURT:

BRUCE S. JENKINS
United States Senior District Judge

kam

United States District Court
for the
District of Utah
February 4, 2002


* * CERTIFICATE OF SERVICE OF CLERK * *


Re:    2:98-cv-00882



True and correct copies of the attached were either mailed or faxed by the
clerk to the following:


    Gay Elizabeth Kang, Esq.
    US DEPARTMENT OF JUSTICE
    TORT CLAIMS/CIVIL LITIGATION
    PO BOX 340
    BEN FRANKLIN STATION
    WASHINGTON, DC  20044
    JFAX 8,202,6164989

    Daniel D. Price, Esq.
    US ATTORNEY'S OFFICE
    ,
    JFAX 9,5245985

    Kirsten L. Wilkerson, Esq.
    US DEPT OF JUSTICE
    PO BOX 340
    WASHINGTON, DC  20044

    Mr. Randall N Skanchy, Esq.
    SCOTT M MATHESON COURTHOUSE
    450 S ST ST #W43
    SALT LAKE CITY, UT  84111

    Mr. Anthony L Rampton, Esq.
    JONES WALDO HOLBROOK & MCDONOUGH
    170 S MAIN ST STE 1500
    PO BOX 45444
    SALT LAKE CITY, UT  84145-0444
    JFAX 9,3280537

    Mr. James R. Holbrook, Esq.
    CALLISTER NEBEKER & MCCULLOUGH
    10 E SOUTH TEMPLE STE 900
    SALT LAKE CITY, UT  84133
    JFAX 9,3649127